## AFFIDAVIT IN SUPPORT OF
## SEARCH AND SEIZURE WARRANT

I, Alex J. Zappe, being a duly sworn Special Agent with the Federal Bureau of Investigation, swear under the penalty of perjury, that the following statement is true and correct to the best of my knowledge and belief and is based on the following facts:

## PURPOSE OF THIS AFFIDAVIT

1.      This affidavit is submitted in support of a search and seizure warrant for property located in Mesa County, Colorado.  Based on my investigation, training, experience, and interactions with other law enforcement officers, there is probable cause to believe that Cory Newton THOMPSON has committed violations of Title 18, United States Code, Section § 1343, Wire Fraud; and Title 42, United States Code, Section § 408(a)(7)(B), False Representation of a Social Security Account Number.

2.      I am requesting a search warrant for the residential property at 509 W. Applewood Drive, Fruita, Colorado, further identified in Attachment A.

3.      The facts set forth in this affidavit are based on my direct participation in the investigation, personal observations, my training and experience, and information obtained from other witnesses. This affidavit is intended to show that there is sufficient probable cause to search the locations identified herein, and described more fully in Attachment A, and seize the items identified herein, and described more fully in Attachment B.  I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary and applicable to establish the appropriate foundation of probable cause for the issuance of the

1

requested warrants.  I have not purposely omitted any fact(s) that undermine or are contrary to the opinions and conclusions set forth herein.

## AGENT BACKGROUND

4.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the Denver Division, Grand Junction Resident Agency.  As such, I am an investigative or law enforcement agent of the United States authorized under Title 18, United States Code, Section 3052, that is, an officer of the United States who is empowered by law to conduct investigations, to make arrests, and collect evidence for various violations of federal law.  I have been employed as a Special Agent of the FBI since February 2004.

5.      I have experience in conducting investigations involving financial fraud, public corruption, drug trafficking, violent crimes, gangs, fugitives, crimes aboard aircraft, cyber-related matters, and sensitive investigations involving International and Domestic Terrorism.

6.      Through my experience and training, I have become familiar with activities of individuals engaged in illegal activities, to include their techniques, methods, language, and terms, as well as techniques to conceal or disguise their actions in efforts to evade efforts by law enforcement agencies.

7.     Based on my personal knowledge and information furnished to me by other

federal officers of the FBI and other law enforcement agencies, I am fully aware and

allege the following facts to be true and correct.

## PROBABLE CAUSE

8.     The United States is investigating a complex, financial matter involving a scheme

to defraud.  In October 2016, I began investigating the activities of Cory Newton

THOMPSON, and others involved, with regard to a business partnership between

THOMPSON and the victim of the scheme, identified herein by the initials "KB."  I affirm

that KB is a real person, whose true identity is known to the FBI.

### BACKGROUND INFORMATION

9.     On January 14, 2013, THOMPSON incorporated a business known as DACK

Energy Services, LLC ("DACK") with the Secretary of the State of Colorado.  Having

known KB from youth sports events in the community over the years, THOMPSON

approached KB to see if he was interested in helping to start DACK with financial

support.  KB was known to THOMPSON and others as a wealthy and successful

business owner.

10.    THOMPSON presented a written business plan and hoped KB would be the

source of financial capital to help startup the business.  The potential earnings portrayed

in the plan were attractive to KB, and KB considered the opportunity to be a potentially

lucrative business venture.

      a.     DACK was intended to be a roustabout service company.  That is,

      the company would service oil and gas well sites, including any

maintenance, repairs, and miscellaneous improvements.  These services would be contracted by energy companies who own the well sites.

b.       In general, roustabout work is performed under a Master Service Agreement (MSA) as well as a specified Purchase Order number that authorizes the scope and quantity of the work to be done.  Contract maintenance workers perform necessary jobs and record the work performed on a handwritten Field Ticket.  The completed field tickets are reviewed by energy company representatives, who verify the completed work and sign the tickets.  An invoice is then created from the completed and authorized field tickets and both the field tickets and the invoices are sent to the energy company to be processed for payment.  I have learned that the industry standard for payment on outstanding invoices can vary between 30 to 90 days.

11.    On December 5, 2013, THOMPSON and KB entered into a business partnership to run DACK.  KB, as the investor partner, provided the funding capital while THOMPSON, as the operating partner, was responsible for the operational aspects of the business.  THOMPSON's responsibilities included hiring employees, acquiring and entering into contracts with oil and gas companies, managing work production, procuring vehicles and necessary equipment, invoicing services rendered, and ensuring payments were received.  KB set up the operating bank account for the company at Home Loan State Bank and Timberline Bank, in Grand Junction, Colorado, provided a part-time accountant, and provided the money to fund the business.

4

12.     At the beginning of the business, THOMPSON acquired a few small contracts in Wyoming which generated minor income.  He hired family members and friends as employees.  He reported to KB that he got a contract with two energy companies in Wyoming – Enterprise Production and Berry Petroleum.  With the new contracts, he claimed he needed to hire more employees.

13.     THOMPSON also told KB that he was pursuing large contracts in Texas that would be lucrative.  He discussed the large future jobs with KB and expressed the need to continue investing in new employees and equipment.  As part of his invoicing responsibilities, THOMPSON would also send copies of invoices to the DACK accountant so that they could be entered in the accounting records as income.  The invoices were added to the Accounts Receivable (A/R) account – representing work completed, invoiced, and awaiting payment.  As months passed, the amount of unpaid invoices in the A/R account started to grow substantially.

14.     In mid-2015, THOMPSON convinced KB that he had a contract in Texas that was worth at least half a million dollars and would require additional funding to get the contract and complete the work.  Believing the contract was a real possibility, and seeing it as an opportunity for the company to really take off, KB sought outside funding.  KB accepted two loans from friends, of $750,000 and $500,000 respectively. KB backed these loans with his own personal guarantee in the event DACK was not able to cover them.  KB then acquired new office space and hired an office manager to assist in the administration of the business.  KB also hired a full-time accountant in anticipation that the business would require it.

15.     No contract in Texas ever came to fruition and the work promised did not happen as THOMPSON portrayed it.  The A/R amounts were still growing and the expenditures drained the newly-invested funds.  KB had invested approximately $1.48 million of his own money into the company with no return.  The A/R amount stood at approximately $1.49 million in uncollected revenues.

16.     KB, realizing DACK was not financially sustainable, took measures to end the business relationship. THOMPSON and KB agreed to end the partnership at the end of February 2016.  As part of the separation, THOMPSON agreed to purchase the company and pay back KB for his invested funds.  When THOMPSON failed to pay as promised, KB sought and received a Decree of Dissolution, which was issued by Mesa County District Judge Valerie Robison on June 23, 2016.  This decree granted KB the right to take control of the DACK entity and liquidate assets.  As a result of the civil proceedings and acquisition of documents and records, KB discovered that THOMPSON had defrauded him out of the invested money.  KB brought the matter to the FBI for further investigation.

<u>THE SCHEME</u>

17.     In 2016, I began investigating this matter.  From this investigation, I learned that THOMPSON set up a few contracts with energy companies, and some legitimate work was performed by DACK in Wyoming and Texas.  I also discovered that the majority of THOMPSON's claims of work and contracts were false.

> a.      Through lawful means, I obtained business records from Enterprise Production, Berry Petroleum, West Texas Gas, and ConocoPhillips.

Thompson had submitted invoices to the DACK accountant claiming that work had been performed for each of these companies.  The records and declarations from these companies, however, proved that DACK never had a contract with, nor performed any work for, any of them.

b.      In addition, I received records from Linn Energy, Merit Energy, Enerflex Energy, and Unit Corporation.  These records confirmed that some of the work claimed by THOMPSON had been performed, invoiced, and paid to DACK.  However, 173 invoices THOMPSON had submitted to KB and the DACK accountant related to these companies were fictitious; the claimed work was never completed and the amounts claimed were not owed to DACK.

c.      In total, from January 6, 2014 to January 15, 2016, THOMPSON created and submitted $1,492,009.50 in fictitious invoices to portray to KB that work was being performed and continued investment was needed. KB relied on these invoices in deciding to invest in DACK.

d.      THOMPSON submitted the majority of the fictitious invoices from his email account cory@dackenergy.com.  This email account is serviced by Google.  I learned from Google that the emails, with attached fake invoices, were transmitted through servers in several states throughout the United States, and eventually received by DACK employees in Colorado, thus affecting interstate commerce.

7

18.     During the course of this investigation, I also learned that THOMPSON opened

several accounts at Alpine Bank.  These accounts were created and used without the

knowledge of KB.

19.     The investigation also revealed that THOMPSON created two fictitious

employees in order to steal funds from the company.

> a.      THOMPSON claimed that he hired two employees, Alejandro
>
> Bustos and Adam Martinez, to work for DACK.  In July 2014, THOMPSON
>
> submitted these names to the DACK accountant to add them to the
>
> payroll, along with dates of birth, social security account numbers, and
>
> addresses.
>
> b.      The social security account numbers used by Thompson for these
>
> "employees," however, belong to different people.  Agents interviewed the
>
> individuals that the Social Security Administration reported the numbers
>
> were associated with.  Neither had any knowledge of Thompson,
>
> Alejandro Bustos, Adam Martinez, or DACK Energy Services, LLC.
>
> c.      Additionally, I investigated the addresses that THOMPSON
>
> provided for these fictitious employees.  By utilizing the Wyoming State
>
> Property Assessor database, I discovered that the addresses
>
> THOMPSON provided do not exist in Wyoming, and are likewise fictitious.
>
> d.      Between July 24, 2014, and January 8, 2016, THOMPSON directed
>
> DACK to pay $80,691.66 in wages to fictitious employee Adam Martinez
>
> from numerous bank accounts.  During the same timeframe, THOMPSON

directed DACK to pay $83,323.71 in wages to fictitious employee Alejandro Bustos from numerous bank accounts.

e.      Unlike other DACK employees, who received their wages via bank direct deposit, THOMPSON directed the weekly paychecks for Martinez and Bustos to be printed, physical checks.  THOMPSON himself picked up the checks each Friday, stating he was going to hand deliver them to the employees.  However, THOMPSON endorsed the checks, payable to himself, and deposited them directly into an account he controlled at Alpine Bank.

20.     As indicated above, the majority of the work THOMPSON claimed to be conducting was entirely fictitious.  During DACK's operation, THOMPSON received hourly and salaried payments based on this fictitious work.  The wages to THOMPSON, combined with payments to the fictitious employees discussed above, represents $433,430.56 in funds stolen from DACK company accounts.

21.     Throughout this investigation, I interviewed several former DACK employees, which were largely friends and acquaintances of THOMPSON and his family.  From these interviews, I learned that THOMPSON routinely employed individuals to work for DACK, but rarely had them perform any legitimate work for DACK.  Instead, these former employees reported that they were paid $1,200 per week and, if they worked at all, THOMPSON asked them to perform personal services for THOMPSON and his immediate family, including landscaping tasks, maintenance on recreational vehicles purchased by THOMPSON, and babysitting THOMPSON's son.  Similarly, one

9

employee reported that he was assigned to work in Texas for 8 months and was paid a salary for that entire period.  However, the employee estimated that he, and others he worked with, only completed approximately 2 months of legitimate work during that 8 month period.  The remainder of the time, the workers were idle but collecting a salary nevertheless.

22.     Finally, even after KB indicated that DACK could no longer continue to operate, THOMPSON continued to defraud KB out of revenues that were owed to DACK.

a.     Without KB's knowledge, THOMPSON formed a similarly-named company—"Dack Field Services"—as a means to continue drawing on the few legitimate contracts he had established under the DACK name and business.  On March 3, 2016, Thompson opened two accounts with US Bank in Grand Junction, CO.

b.     Thompson collected deposits into both of these accounts from energy companies for legitimate work previously performed by DACK. THOMPSON did not notify KB of the continued revenue stream derived from DACK operations and failed to provide KB with any portion of the funds.

c.     In fact, THOMPSON drew down funds from these accounts to zero, and the bank closed the accounts.  Thereafter, THOMPSON sought to find another bank to do business with.

d.     In July 2016, THOMPSON opened accounts with Grand Junction Federal Credit Union in furtherance of the fraud scheme.  From August 1,

> 2016, through January 11, 2017, THOMPSON deposited $99,393.75 in
>
> payments for worked conducted by DACK into one of these accounts.
>
> THOMPSON later transferred approximately $36,500.00 to his wife's
>
> account.

23.    On February 21, 2019, a federal grand jury indicted THOMPSON on 13 counts of

wire fraud, and two counts of false representation of a social security number.  I intend

to execute the requested warrants contemporaneous with his arrest.

### ACQUISITION OF ASSETS FROM ILLEGAL PROCEEDS

24.    During this investigation, other agents and I have reviewed bank records for

accounts belonging to the following individuals and entities:  Cory THOMPSON,

Christine Thompson (THOMPSON's wife), Larry Thompson (THOMPSON's father),

Dylon Thompson (THOMPSON's son), DACK Energy Services, LLC; and DACK Field

Services, LLC.  This financial analysis has revealed that the following assets were

acquired and maintained, either in whole or in part, using proceeds from the fraudulent

scheme.

> a.  The defendant's primary residence located at 509 W. Applewood Dr.,
>
> Fruita, Colorado 80521-3300.  I know this property to be the primary
>
> residence of THOMPSON and his family.  In addition, on February 22,
>
> 2019, I conducted a search of the Mesa County Assessor property
>
> records via their official website and confirmed that THOMPSON is the
>
> sole, listed owner of the property.

b. A 2014 GMC 2500 Denali HD, VIN 1GT120C81EF133872. I have personally observed this vehicle at THOMPSON's residence on numerous occasions, as recently as February 20, 2019. The vehicle is currently registered to THOMPSON.

c. Two (2) 2001 Yamaha Gp800r, HULL YAMA2203A101 and YAMA1162B101. I have personally observed these two watercraft at the business location of Thompson Landscape Maintenance, 2695 Unaweep Avenue, Grand Junction, Colorado. The jet skis are parked in the fenced storage yard of the business. They are currently registered to Dylon Thompson.

d. A 2013 Hyundai Sonata, VIN 5NPEB4AC1DH731609. I have personally seen this vehicle parked at THOMPSON's residence as recent as January 17, 2019. The vehicle is currently registered to Christine Thompson.

e. A 2005 Caravelle 232 Interceptor boat, HULL VCN18140E505, and boat trailer. I have personally seen this boat and trailer parked at Monument Storage, 615 S. Mesa Street, Fruita, Colorado. Furthermore, bank records obtained during the course of this investigation showed a monthly recurring expense of $75.00 paid from THOMPSON's accounts to Monument Storage. The trailer and boat are registered to THOMPSON.

f.   A 2016 GMC Sierra, VIN 1GT12UE82GF134388.  I have personally observed this vehicle at THOMPSON's residence on numerous occasions, as recently as February 20, 2019.  On that date, I observed Christine Thompson operating the vehicle.  The vehicle is currently registered to Cory and Christine Thompson.

g.   A 2015 GMC Sierra, VIN 1GT120E8XFF666138.  I have personally observed this vehicle at THOMPSON's residence on numerous occasions.  I know the vehicle to be used regularly by both THOMPSON and his son, Dylon.  The vehicle is currently registered to Dylon Thompson.

25.   Based on witness interviews, records searches, and my investigation, I believe THOMPSON has taken steps to conceal these assets and their ownership. Additionally, I believe THOMPSON has acquired and concealed other assets utilizing the proceeds of his fraudulent scheme.

## SEARCH AND SEIZURE OF BUSINESS RECORDS

26.   Based on my experience and training, I know business owners and persons(s) engaged in financially related fraud activities, as well as legitimate activities, maintain some or all records (which may be written in paper form, electronic, printed, magnetic, or another media such as a computer, USB drive, or external hard drive) at their business location, their residence, and/or on their person where they can secure them and their contents for extended periods of time.

27.     These records include Tax Forms W-2 and 1099; billing records; invoices; receipts; prepared books or records of financial statements detailing income and expenses; summary sheets/schedules showing periodic income and expense totals; cancelled checks; bank records; deposit slips; check stubs; payroll records; records of capital asset acquisition and disposition; cash disbursement and receipt journals; general and subsidiary ledgers; loan and grant applications; business contracts; calendars; correspondence, notes, memoranda, and telephone records with employees, customers, and regulatory agencies.

28.     In addition to physical documents, businesses and individuals possess computers and computer storage devices containing any or all of the above information that are evidence of criminal acts and/or reflect the receipt and disposition of illegally obtained proceeds or income.

29.     Original business records are ordinarily kept and maintained for extended periods of time, often several years, in both paper and electronic formats.

30.     It is also common practice for businesses to maintain records of the acquisition and disposition of assets.  These records could include titles, deeds, mortgages, leases, grant and loan applications, receipts, sales agreements, procurement bidding and award records, and other records related to ownership.

31.     The flow of funds into and out of a business can be tracked by tracing the money trail.  The money trail is created by the entries into the business records and bank accounts, and by the documents received or prepared to support a transaction.

32.    I have interviewed several former employees of DACK.  One of the employees,

Tyson Smith, stated that THOMPSON maintains a home office in one of the rooms of

his primary residence at 509 W. Applewood Drive, Fruita, Colorado.  In addition I know

that at the outset of DACK's operational period, there was no physical office location

until October 2015.  During that time period, THOMPSON operated the business from

his residence, when not travelling.

33.    In October 2015, KB rented office space at 2536 Rimrock Drive, Grand Junction,

Colorado.  All DACK records that KB was aware of, including invoices, payroll records,

and employee files, were stored at that location.  When the partnership ended in 2016,

the rented space was turned over to THOMPSON.  Shortly thereafter, THOMPSON

failed to pay the rent and the space was locked up by the landlord until THOMPSON

was allowed to clean out the space and remove the contents.  THOMPSON operated

his new company, DACK Field Services, from his home as well.  During the civil lawsuit

proceedings, THOMPSON was ordered by the court to produce and turn over business

records relating to DACK.  He refused to comply with that order.

34.    Furthermore, I know that THOMPSON took steps to conceal his assets during

the civil proceedings and concurrent bankruptcy filing.  For example, vehicle registration

records show that he transferred the registration of two Yamaha Wave Runner jet skis

to his son, Dylon Thompson.  The jet skis were moved from a known storage location to

a commercial business storage yard to conceal their location.  The business and

storage yard belongs to a neighbor of THOMPSON.  Other individuals that I interviewed

15

relayed statements by Thompson, as well as his wife and son, that the assets needed to be hidden so that KB could not find them.

35.     I therefore submit that business records relating to and generated from DACK and DACK Field Services, as described in Attachment B, will be located at the residence of Thompson, located at 509 W. Applewood Drive, Fruita, Colorado.

### SEIZURE AND SEARCH OF COMPUTERS

36.     As described above and in Attachment B, I submit that if computers or storage media are found at the locations described in Attachment A, there is probable cause to search and seize those items for the reasons stated herein.  Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

37.     For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data.  Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks, floppy, tape and/or CD-ROM and printing activity.  Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed.  Volatile data and its corresponding evidentiary value are lost when a computer is powered-off and unplugged.

38.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

39.    Also, again based on my training and experience, wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.  Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted

portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

40.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

41.    Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

42.    "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat,"  instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates)

may be evidence of who used or controlled the computer or storage medium at a relevant time.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

43.    I know from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.  Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

44.    Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques.  For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed.  Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names.  As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents.  Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in

this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.  Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space.  This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

45.     Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment.  This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment.  This is true because of the following:

> a.     The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the

controlled environment of a laboratory is essential to its complete and accurate analysis.

b.      The volume of evidence and time required for an examination. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

c.      Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be

required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.    Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

46.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant.  The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

47.    Based on the facts set forth in this affidavit, there is probable cause to believe that THOMPSON has committed violations of Title 18, United States Code, Section 1343, Wire Fraud; and Title 42, United States Code, Section 408(a)(7)(B), False Representation of a Social Security Account Number.  Furthermore, there is probable cause to believe that THOMPSON's primary residence, described more fully in Attachment A, will contain the items set forth in Attachment B, and probable cause exists to search that location for the items described in Attachment B.  These items

constitute evidence of the commission of criminal offenses and are contraband, fruits of

the crime, things otherwise criminally possessed, and property designed or intended for

use, or that is or has been used, as the means of committing the criminal offenses

identified above.

   I, Alex J. Zappe, being duly sworn according to law, hereby state that the facts
stated in the foregoing affidavit are true and correct to the best of my knowledge,
information, and belief.

            Respectfully submitted,


             _/s/ Alex J. Zappe_____
            Alex J. Zappe
            Special Agent, FBI


Submitted, attested to, and acknowledged by reliable electronic means on this___27____ day of
February, 2019.

           s/ Gordon P. Gallagher
          _____
          Gordon P. Gallagher
          United States Magistrate Judge


Reviewed and submitted by Jeremy Chaffin, Assistant United States Attorney.

**ATTACHMENT A**

**<u>DESCRIPTION OF LOCATIONS TO BE SEARCHED</u>**

<u>Location</u>: 509 W. Applewood Drive, Fruita, Colorado

      This is the primary residence of Cory Thompson. It consists of a single-family, two-story house with an attached garage. There is also a shed on the property within the fenced in curtilage. The entire premise is to be searched to include the shed and any vehicles located on site.



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

The following items that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 18, United States Code, Sections § 1343 and Title 42, United States Code, Section § 408(a)(7)(B):

1. Documents and records, physical or electronic, relating to business transactions, contracts, invoices, purchases and expenses conducted by, or on behalf of, DACK Energy Services, LLC or DACK Field Services, including the following:

   a. Employee files, new hire worksheets, payroll records.

   b. Employee expense reports, receipts submitted for reimbursement, corresponding approval documents, and reimbursement records.

   c. Documents and records, physical or electronic, relating to vehicles and equipment acquisition, conducted by, on behalf of, or in relation to DACK Energy Services or DACK Field Services, including the ordering, purchasing, acquisition, liquidation, sales, auctioning, or disposal of the same.

   d. Documents and records, physical or electronic, relating to contracts, bids, bid proposals, bid ratings, conducted by, on behalf of, or in relation to Enterprise Products, Berry Petroleum, West Texas Gas, ConocoPhillips, Linn Energy, Merit Energy, Enerflex Energy Systems, Unit Petroleum, and Energes, LLC.

   e. Correspondence in any form, physical or electronic, including letters, mailings, emails, texts, chats, and instant messages, relating to or associated with the items described above.

2. Credit card information, bills and payment records belonging to or in use by Cory Thompson.

3. Indicia related to occupancy, residency and or ownership of property, premises, or vehicles.

4. Documents and records, and any related communications, indicating the acquisition of, concealment, transfer of ownership, or disposition of assets obtained with proceeds from violations of Title 18, United States Code, Sections

§ 1343 and Title 42, United States Code, Section § 408(a)(7)(B), including the following assets:

a. Real Property located at 509 W. Applewood Dr, Fruita, Colorado 80521-3300;

b. 2014 GMC 2500 Denali HD, VIN 1GT120C81EF133872;

c. 2013 Hyundai Sonata, VIN 5NPEB4AC1DH731609;

d. 2015 GMC Sierra, VIN 1GT120E8XFF666138;

e. 2016 GMC Sierra, VIN 1GT12UE82GF134388;

f. 2005 Caravelle 232 Interceptor boat, HULL VCN18140E505, and trailer;

g. Two (2) 2001 Yamaha Gp800r, HULL YAMA2203A101 and YAMA1162B101.

5. Identification documents, such as social security cards, driver's licenses, photographs, applications for licenses, or other indicia representing the unlawful obtaining of identifications of persons.

6. Computer(s), computer hardware, computer software, computer related documentation, computer passwords and data security devices, digital storage media, any physical object upon which computer data can be recorded, digital communications devices, cameras, videotapes, video recording devices, video recording players, and video display monitors, digital input and output devices such as electronic media and network equipment, modems, routers, connection and power cords, and external or connected devices used for accessing computer storage media that was used to commit or facilitate commissions of violations of Title 18, United States Code, Sections § 1343 and Title 42, United States Code, Section § 408(a)(7)(B).

7. For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, COMPUTER) that is called for by this warrant, or that might contain items otherwise called for by this warrant:

a. evidence of who used, owned, or controlled the COMPUTER at the time the items described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, user profiles, e-mail, e-mail contacts, "chat" or instant messaging logs, photographs, and correspondence;

b. evidence of software that may allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f. evidence of the times the COMPUTER was used;

g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i. contextual information necessary to understand the evidence described in this attachment;

j. volatile data necessary to preserve evidence prior to powering-off and unplugging a running computer.

k. any and all information, notes, software, documents, records, or correspondence, in any format and medium pertaining to violations of Title 18, United States Code, Sections § 1343 and Title 42, United States Code, Section § 408(a)(7)(B)

l. items otherwise described in this attachment but contained on an electronic device of any sort.

8. If evidence located on a COMPUTER appears to relate to criminal acts other than violations of Title 18, United States Code, Sections § 1343 and Title 42, United States Code, Section § 408(a)(7)(B) and that are not listed in this Attachment, those items will not be further examined unless and until a search warrant is applied for and issued for evidence of any such separate criminal act.

<u>DEFINITIONS:</u>

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).